## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION AT CLEVELAND

| | |
|---|---|
| **GEORGE G. KOUSTIS,** individually and on behalf of all others similarly situated, c/o Dann Law P.O. Box 6031040 Cleveland, OH 44113 | Case No. **CLASS ACTION COMPLAINT FOR DAMAGES** **DEMAND FOR JURY TRIAL** |
| **RONALD J. COLLINS,** individually and on behalf of all others similarly situated, c/o Dann Law P.O. Box 6031040 Cleveland, OH 44113 | |
| Plaintiffs, | |
| v. | |
| **SELECT PORTFOLIO SERVICING, INC.** c/o Corporation Service Company 50 West Broad Street, Suite 1330 Columbus, OH 43215 | |
| Defendant. | |

Plaintiffs George C. Koustis and Ronald J. Collins, individually, and on behalf of all others similarly situated, by and through counsel, bring this action against Defendant Select Portfolio Servicing, Inc., and for their Class Action Complaint state:

### PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff George G. Koustis ("Koustis") is a natural person residing in Geauga County, Ohio.

2.      Plaintiff Ronald J. Collins ("Collins") is a natural person residing in Palm Beach County, Florida. Koustis and Collins shall be referred to collectively as "Plaintiffs".

3.      Defendant Select Portfolio Servicing, Inc. ("Defendant" or "SPS") is a federal depository institution incorporated under the laws of the State of Utah, and, upon belief, maintains its headquarters located in Salt Lake City, Utah.

4.      SPS does business in the state of Ohio and is licensed to do business in the state of Ohio as a foreign corporation.

5.       This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331, as this action arises under the Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2601, *et seq.* ("RESPA").

6.      Venue lies in this District pursuant to 28 U.S.C. § 1391(b), as a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

## RESPA AND REGULATION X

7.      Congress enacted RESPA, in part, to ensure "that consumers throughout the nation are provided with greater and timelier information on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges caused by abusive practices that have developed in some areas of the country." 12 U.S.C. § 2601(a). Since "Congress intended RESPA to serve consumer-protection purposes[,] RESPA's provisions relating to loan servicing procedures should be 'construed liberally' to serve the statute's remedial purpose." *Medrano v. Flagstar Bank, FSB*, 704 F.3d 661, 665-666 (9th Cir. 2012) (citations omitted).

8.      To that end, RESPA permits a borrower (or an agent of a borrower) to submit a "qualified written request" ("QWR") to the servicer of the borrower's "federally related mortgage loan." 12 U.S.C. § 2605(e)(1)(B). In sending a QWR to a mortgage loan servicer ("servicer"), a borrower can either request information from the servicer, or assert that the borrower's account is in error. 12 U.S.C. § 2605(e)(1)(B)(ii).

9.      RESPA provides that upon receipt of a QWR "a servicer of a federally related mortgage loan…shall provide a written response acknowledging receipt of the correspondence within 5 days (excluding legal public holidays, Saturdays, and Sundays) unless the action requested is taken within such period." 12 U.S.C. § 2605(e)(1)(A).

10.     Regarding QWRs that request a servicer to correct an error related to the servicing of a loan, RESPA provides that "not later than 30 days (excluding legal public holidays, Saturdays, and Sundays) after the receipt from any borrower of any qualified written request…the servicer shall…make appropriate corrections in the account of the borrower, including the crediting of any late charges or penalties, and transmit to the borrower a written notification of such correction" or, after conducting an investigation, "provide the borrower with a written explanation or clarification that includes…a statement of the reasons for which the servicer believes the account of the borrower is correct" either of which such notice "shall include the name and telephone number of a representative of the servicer who can provide assistance to the borrower." 12 U.S.C. §§ 2605(e)(2)(A)-(B).

11.     Regarding QWRs that request information as to a loan, RESPA provides that "not later than 30 days (excluding legal public holidays, Saturdays, and Sundays) after the receipt from any borrower of any qualified written request…the servicer shall…provide the borrower with a written explanation or clarification that includes" the "information requested by the borrower or an explanation of why the information requested is unavailable or cannot be obtained by the servicer; and the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower." 12 U.S.C. § 2605(e)(2)(C).

12.     While some courts have limited servicers' obligations under 12 U.S.C. § 2605(e) to only QWRs that relate to the "servicing" of a mortgage loan, the statutory definition of QWRs is not limited to only inquiries which relate to servicing.  *Medrano*, 704 F.3d at 666, fn. 4. ("The district court, like many courts that have addressed the issue, conflated the statutory analysis by declaring that the letters were not qualified written requests because they did not request information relating to servicing. Section 2605(e)(1)(B), which defines what is a qualified written request, does not refer to 'information relating to…servicing.' Instead, that requirement derives from § 2605(e)(1)(A), which requires, as conditions for triggering the duty to respond, both (1) that the letter is a qualified written request and (2) that it requests information relating to servicing. Although this distinction may be meaningless in most cases, we clarify that this opinion concerns the interpretation of § 2605(e)(1)(A).").  In other words, a borrower's inquiry or assertion of an error need not relate to servicing in order to constitute a QWR, but if it does not, a servicer's obligations under 12 U.S.C. § 2605(e) are not triggered.  *E.g.*, *Hock Huat Yap v. Deutsche Bank Nat'l Trust Co.*, 2018 WL 4095167, at *3 (D. Ariz. Aug. 28, 2018) ("The *Medrano* court made clear that the [requirement that a QWR relate to servicing] was actually regarding what would trigger a servicer's duty to acknowledge receipt of a QWR under Section 2605(e)(1)(A), which requires that the request be a QWR *and* that the requested information in the QWR relate to the servicing of the loan.") (emphasis in original).

13.     In light of some courts' narrow interpretation of servicers' duties under Section 2605(e) of RESPA, RESPA was amended through the Dodd-Frank Wall Street Reform and Consumer Protection Act—Public Law No. 111-203, 124 Stat. 1376 (2010)—in part to add 12 U.S.C. § 2605(k) which imposed further obligations on servicers.

14.     As amended, it is a violation of RESPA for a servicer to "fail to take timely action to respond to a borrower's requests to correct errors relating to allocation of payments, final balances for purposes of paying off the loan, or avoiding foreclosure, or other standard servicer's duties."  12 U.S.C. § 2605(k)(1)(C).

15.     Further, RESPA, as amended, requires servicers to respond to inquiries from borrowers seeking the identity and contact information of the owner or assignee of borrowers' mortgage loans within ten (10) business days. 12 U.S.C. § 2605(k)(1)(D).

16.     Moreover, in January 2013, pursuant to the authority granted by the Dodd-Frank Wall Street Reform and Consumer Protection Act—Public Law No. 111-203, 124 Stat. 1376 (2010)—the Consumer Finance Protection Bureau ("CFPB") issued a number of final rules concerning mortgage markets in the United States—known as "Regulation X" and codified as 12 C.F.R. § 1024.1, *et seq.*  Regulation X became effective on January 10, 2014.

17.     Regulation X further expanded servicers' obligations under RESPA because RESPA, as amended, makes it unlawful for a servicer to "fail to comply with any other obligation found by the Bureau of Consumer Financial Protection, by regulation, to be appropriate to carry out the consumer protection purposes of this chapter." 12 U.S.C. § 2605(k)(1)(E).

18.     Through Regulation X, the CFPB has provided guidance for the interpretation of certain RESPA provisions, including servicers' duties when responding to borrowers' QWRs. Regulation X also imposed requirements upon servicers in responding to two (2) new categories of correspondence from borrowers related to their mortgage loans; specifically, Requests for Information ("RFIs") and Notices of Error ("NOEs").  "While there is significant overlap between QWRs and [NOEs] and [RFIs], the terms are not synonymous. The CFPB has made this clear in its official interpretation of the regulations: 'A qualified written request is just one form that a

written notice of error or information request may take. Thus, the error resolution and information request requirements in §§ 1024.35 and 1024.36 apply as set forth in those sections irrespective of whether the servicer receives a qualified written request.' 12 C.F.R. § 1024, Supp. I." *E.g.*, *Messina v. Green Tree Servicing, LLC*, 210 F.Supp.3d 992, 1007 (N.D. Ill. 2016).

19.     Relative to RFIs, Regulation X provides that "a servicer shall comply with the requirements of this section for any written request for information from a borrower that includes the name of the borrower, information that enables the servicer to identify the borrower's mortgage loan account, and states the information the borrower is requesting with respect to the borrower's mortgage loan." 12 C.F.R. § 1024.36(a).

20.     12 C.F.R. § 1024.36(d)(1) provides that a servicer must respond to an RFI by either "[p]roviding the borrower with the requested information and contact information, including a telephone number, for further assistance in writing" or "[c]onducting a reasonable search for the requested information and providing the borrower with a written notification that states that the servicer has determined that the requested information is not available to the servicer, provides the basis for the servicer's determination, and provides contact information, including a telephone number, for further assistance."

21.     Notwithstanding the foregoing, Regulation X provides for certain exceptions to servicers' obligations to respond to RFIs. For example, 12 C.F.R. § 1024.36(f)(1) provides that a servicer does not have to comply with 12 C.F.R. § 1024.36(d) if the request seeks substantially the same information as a prior request, the information sought is confidential, proprietary, or privileged, the information is not directly related to the borrower's specific mortgage loan account, or the request is overbroad or unduly burdensome.

22.     If a servicer determines that it is exempted from responding to an RFI, pursuant to 12 C.F.R. § 1024.36(f)(1), Regulation X requires the servicer to "notify the borrower of its determination in writing not later than five days (excluding legal public holidays, Saturdays, and Sundays) after making such determination," setting forth the specific "basis under paragraph (f)(1) of this section upon which the servicer has made such determination." 12 C.F.R. § 1024.36(f)(2).

23.     Importantly, unlike QWRs, RFIs do not need to relate directly to "servicing" in order to trigger the aforementioned duties under Regulation X.  The CFPB specifically addressed the "servicing" issue in its commentary on 12 C.F.R. § 1024.36(f): "While the final rule does not require that servicers undertake the information request procedures in § 1024.36(c) and (d) for oral submissions, *it does not limit information requests to those related to servicing*." 78 F.R. 10696, 10761 (emphasis added). Therefore, a servicer is required to respond to "any written request for information," and the scope of 12 C.F.R. § 1024.36(a) is not limited to "requests relating to servicing." *E.g.*, *Pollack v. Seterus, Inc.*, Civil Action No. 17-60475-Civ, 2017 U.S. Dist. LEXIS 202827, at *8-9 (S.D. Fla. Dec. 7, 2017); *St. Claire v. Ditech Fin. LLC*, No. 1:17-CV-03370-AT-JFK, 2018 U.S. Dist. LEXIS 219661, at *11 (N.D. Ga. Sept. 21, 2018).

24.     Relative to NOEs, Regulation X provides that "[a] servicer shall comply with the requirements of this section for any written notice from the borrower that asserts an error and that includes the name of the borrower, information that enables the servicer to identify the borrower's mortgage loan account, and the error the borrower believes has occurred…A qualified written request that asserts an error relating to the servicing of a mortgage loan is a notice of error for purposes of this section, and a servicer must comply with all requirements applicable to a notice of error with respect to such qualified written request." 12 C.F.R. § 1024.35(a).

25.     12 C.F.R. § 1024.35(e)(1) provides that a servicer must respond to an NOE by either "[c]orrecting the error or errors identified by the borrower and providing the borrower with a written notification of the correction, the effective date of the correction, and contact information, including a phone number, for further assistance" or "[c]onducting a reasonable investigation and providing the borrower with written notification that includes a statement that the servicer has determined that no error occurred, a statement of the reason or reasons for this determination, a statement of the borrower's right to request documents relied upon by the servicer in reaching its determination, information regarding how the borrower can request such documents, and contact information, including a phone number, for further assistance."

26.     Notwithstanding the foregoing, Regulation X provides for certain exceptions to servicers' obligations to respond to NOEs. For example, 12 C.F.R. § 1024.35(g)(1) provides that a servicer does not have to comply with 12 C.F.R. § 1024.35(e) if the NOE asserts an error that is substantially similar to an error that the servicer has previously adequately addressed, the NOE is so vague that the servicer cannot reasonably determine the specific error being asserted, or the servicer no longer services the loan, such that the NOE is untimely.

27.     If a servicer determines that it is exempted from responding to an NOE, pursuant to 12 C.F.R. § 1024.35(g)(1), Regulation X requires the servicer to "notify the borrower of its determination in writing not later than five days (excluding legal public holidays, Saturdays, and Sundays) after making such determination," setting forth the specific "basis under paragraph (g)(1) of this section upon which the servicer has made such determination." 12 C.F.R. § 1024.35(g)(2).

28.     Further, in issuing Regulation X, the CFPB explained how the scope of NOEs are broader than that of QWRs, in that "standard servicer duties," as referenced in 12 U.S.C. § 2605(k)(1)(C), "are those typically undertaken by servicers in the ordinary course of business.

*Such duties include not only the obligations that are specifically identified in section 6(k)(1)(C) of RESPA, but also those duties that are defined as 'servicing' by RESPA, as implemented by this rule, as well as duties customarily undertaken by servicers to investors and consumers in connection with the servicing of a mortgage loan. These standard servicer duties are not limited to duties that constitute 'servicing,' as defined in this rule,* [emphasis added] and include, for example, duties to comply with investor agreements and servicing program guides, to advance payments to investors, to process and pursue mortgage insurance claims, to monitor coverage for insurance (*e.g.*, hazard insurance), to monitor tax delinquencies, to respond to borrowers regarding mortgage loan problems, to report data on loan performance to investors and guarantors, and to work with investors and borrowers on options to mitigate losses for defaulted mortgage loans." 78 Fed. Reg. 10696, 10739.

29. Finally, RESPA and Regulation X impose requirements on servicers to respond to certain other inquiries from borrowers, even if those inquiries do not constitute QWRs, RFIs, or NOEs.

30. For example, as noted above, RESPA requires servicers to respond to inquiries from borrowers seeking the identity and contact information of the owner or assignee of borrowers' mortgage loans within ten (10) business days, regardless of whether those inquiries are QWRs or RFIs. 12 U.S.C. § 2605(k)(1)(D).

31. Similarly, 12 C.F.R. § 1024.35(b)(6) permits a borrower to submit an NOE regarding a servicer's "failure to provide an accurate payoff balance amount upon a borrower's request," even though a request for a payoff balance is governed by 12 C.F.R. § 1026.36(c)(3), and not the provisions of Regulation X relating to RFIs and NOEs.

32.     As used herein, these types of inquiries—which necessitate a response under RESPA or Regulation X, and/or give rise to grounds to assert an error pursuant to 12 C.F.R. § 1024.35(b)—will be referred to as "Other Covered Inquiries." Collectively, QWRs, RFIs, NOEs, and Other Covered Inquiries will be hereinafter referred to as "Borrower Inquiries."

## STATEMENT OF FACTS

33.     SPS is a mortgage "servicer" as that term is defined by 12 C.F.R. § 1024.2(b) and 12 U.S.C. § 2605(i)(2). SPS is the current servicer of Plaintiffs' and Class (defined *infra*) members' notes, and mortgages on real property that secure those notes (collectively referred to hereinafter as the "loans").

34.     Plaintiffs' and Class members' loans are each a "federally related mortgage loan" as defined by RESPA and Regulation X. 12 U.S.C. § 2602(1); 12 C.F.R. § 1024.2(b).

35.     As such, SPS is subject to the requirements of RESPA and Regulation X, and does not qualify for the exception for "small servicers"—as defined by 12 C.F.R. § 1026.41(e)(4)—nor for the exemption for a "qualified lender"—as defined by 12 C.F.R. § 617.7000.

36.     Plaintiffs and Class members each submitted one or more Borrower Inquiries—as defined by 12 U.S.C. § 2605(e)(1)(B), 12 C.F.R. §§ 1024.35 and 1024.36, and/or otherwise falling within the purview of 12 U.S.C. §§ 2605(k)(1)—to Wells Fargo.

37.     Plaintiffs and Class members each submitted their Borrower Inquiries to SPS at the address, email address, and/or facsimile number SPS designated for receipt of NOEs and RFIs, pursuant to 12 C.F.R. § 1024.35(c) and 12 C.F.R. § 1024.36(d), respectively (the "Designated Address").

38.     In response to Plaintiffs' and Class members' Borrower Inquiries, SPS replied with form letters (the "Active Litigation Letters") each stating that:

> The issues presented in the inquiries are part of an ongoing litigation. SPS is aware of the issues presented in your letter and would like to work with you to reach a resolution. Due to the current litigation, SPS believes that it would be more appropriate to refrain from providing a detailed response to you at this time. We encourage you to continue working with our legal counsel to determine the available resolution options.

SPS did not otherwise make a substantive response to Plaintiffs' and Class members' Borrower Inquiries following the issuance of the Active Litigation Letters.

39.     Although 12 C.F.R. § 1024.35(g) and 12 C.F.R. § 1024.36(f) each set forth certain exceptions to SPS's requirement to respond to Plaintiffs' and Class members' Borrower Inquiries, there is no "active litigation" exception to SPS's obligation to respond to Borrower Inquiries under RESPA or Regulation X.[1]

40.     As such, SPS failed to provide adequate written responses to Plaintiffs' and Class members' Borrower Inquiries as required by 12 C.F.R. § 1024.35(e), 12 C.F.R. § 1024.36(d), and 12 U.S.C. § 2605(k)(1).

41.     Specifically, relative to Plaintiffs and members of the Class who submitted RFIs, SPS did not provide the requested information or documentation pertaining to the specific information sought in those RFIs, as required by 12 C.F.R. § 1024.36 and 12 U.S.C. §§ 2605(k)(1)(D) and (E).  This includes, but is not limited to, Plaintiffs' and Class members' RFIs which also constituted QWRs.

---

[1] *See Schmidt v. Wells Fargo Bank, N.A.*, 2:17-cv-01708, at *3 (D. N.J. Oct. 8, 2019) ("[T]he Court agrees with Judge Falk's decision not to read a "litigation exception" into the statute. Op. at 5 (Nov. 30, 2018). Defendants do not cite any statute or regulation providing for such an exception and the Court is unconvinced by the sources referenced. *See* Op. at 15-18. First, Judge Falk was correct as to the relevance and persuasiveness of *In Re Wiggins*, No. 12-26993 (JKS), 2016 WL 7115864 (Bankr. D. N.J. Dec. 6, 2016). *See* Op. at 5 (Nov. 30, 2018). Second, in *Bullock v. Ocwen Loan Servicing*, *LLC*, the defendant's response was deemed substantively sufficient and the court did not rely on a litigation exception. 14-cv-3836, 2016 WL 1588494, at *2 n.6 (D. Md. Apr. 18, 2016).").

42.     Similarly, relative to Plaintiffs and members of the Class who submitted NOEs, SPS did not correct any errors or conduct any investigation into the errors asserted in those NOEs, as required by 12 C.F.R. § 1024.35 and 12 U.S.C. §§ 2605(k)(1)(C) and (E).  This includes, but is not limited to, Plaintiffs' and Class members' NOEs which also constituted QWRs.

43.     Relative to Plaintiffs and members of the Class who submitted Other Covered Inquiries, SPS did not provide the requested information or documentation, and/or did not take timely action to correct errors asserted therein, as required by 12 U.S.C. § 2605(k)(1).  This includes, but is not limited to, Plaintiffs' and Class members' Other Covered Inquiries which also constituted QWRs.

44.     As a result of SPS's failure to comply with RESPA and Regulation X, Plaintiffs and Class members were each harmed because they incurred the expenses associated with sending Borrower Inquiries—such as their time, postage, etc.—but they either did not receive the information to which they were legally entitled or did not receive a reasonable investigation of the purported errors regarding their loans, as required under RESPA and Regulation X. Indeed, because SPS "failed to do that which it was obligated to do [under RESPA]" the time and expense associated with Plaintiffs' and Class members' submission of RFIs and NOEs to SPS "metamorphosed into damages." *Marais v. Chase Home Fin., LLC*, 24 F.Supp.3d 712, 728 (S.D. Ohio 2014); *Justice v. Ocwen Loan Servicing*, 2015 WL 235738, at *19 (S.D. Ohio 2015); *McMillen v. Resurgent Capital Services, L.P.*, 2015 WL 5308236, at *10 (S.D. Ohio 2015); *Dale v. Selene Fin. LP*, 2016 WL 6024580, at *3 (N.D. Ohio 2016).

45.     Subsequently, Plaintiffs and certain Class members—*i.e.*, members of the Subclass (defined below)—sent NOEs to SPS concerning SPS's insufficient responses to their initial Borrower Inquiries.

46.     Had SPS adequately responded to Plaintiffs' and Subclass members' Borrower Inquiries, Plaintiffs and Subclass members would not have needed to send NOEs regarding SPS's erroneous assertion of an "active litigation" exception to its obligations under RESPA and Regulation X. As such, Plaintiffs and Subclass members were further harmed by SPS's failure to adequately respond to their Borrower Inquiries, as it required them to incur the expenses associated with sending these subsequent NOEs—such as their time, postage, etc.

47.     SPS's practice of sending Active Litigation Letters and failing to provide substantive responses to Borrower Inquiries is part of a sustained pattern and practice of noncompliance with RESPA and Regulation X. Indeed, SPS's conduct was already the subject of a prior class action lawsuit filed in the Northern District of Ohio, and, upon information and belief, other individual lawsuits across the country. *E.g.*, *Keating v. Select Portfolio Servicing, Inc.*, Case No. 1:19-CV-00852-CAB (N.D. Ohio).

48.     As a majority of homeowners sending Borrower Inquiries are involved in defending against foreclosure, permitting this kind of conduct would allow mortgage servicers and creditors—such as SPS—to unjustly hide behind the foreclosure process to unlawfully extinguish their obligations under RESPA and Regulation X.

49.     Plaintiffs and Class members are asserting claims for relief against SPS for breach of the duties owed to them, pursuant to 12 U.S.C. §§ 2605(e)(2) and (k)(1), 12 C.F.R. § 1024.35, and 12 C.F.R. § 1024.36.

50.     Plaintiffs and Class members have a private right of action, pursuant to 12 U.S.C. § 2605(f), for the claimed breaches, and RESPA provides for remedies including actual damages, costs, statutory damages, and attorneys' fees.

## FACTS RELEVANT TO PLAINTIFFS
### *Plaintiff Koustis*

51.     Koustis, through counsel, sent two (2) Borrower Inquiries dated May 21, 2020 to SPS via certified mail to the Designated Address (the "Koustis Inquiries"). *See*, the Koustis Inquiries, attached hereto as Exhibit 1.  The Koustis Inquiries consisted of an RFI and two (2) Other Covered Inquiries, a request for a payoff statement pursuant to 12 C.F.R. § 1026.36(c)(3) coupled with a request for the "identity, address, and other relevant contact information about the owner or assignee of [his] loan" as contemplated by 12 U.S.C. § 2605(k)(1)(D).

52.     Koustis did not receive a copy of a payoff statement as requested by the Koustis Inquiries.

53.     On or about June 26, 2020, SPS sent an Active Litigation Letter to Koustis's counsel stating that it would not be providing a detailed response to the Koustis Inquiries because his account and the issues presented in the Koustis Inquiries "are part of an ongoing litigation" (the "First Koustis Active Litigation Letter"). *See*, the First Koustis Active Litigation Letter, attached hereto as Exhibit 2.

54.     Nonetheless, on or about June 26, 2020, SPS sent a copy of the "Servicing File" for Koustis's loan to Koustis's counsel, but this was incomplete as it contained incomplete or partial versions of documents requested and otherwise did not contain all the information requested by and through the Koustis Inquiries.

55.     Since Koustis did not receive a payoff statement as requested through the Koustis Inquiries, on July 6, 2020, Koustis, through counsel, sent an NOE to SPS via certified mail to the Designated Address (the "First Koustis NOE"). *See*, the First Koustis NOE, attached hereto as Exhibit 3.

56. On or about July 28, 2020, SPS sent an Active Litigation Letter to Koustis's counsel stating that it would not be providing a detailed response to the First Koustis NOE because his account and the issues presented in the First Koustis NOE "are part of an ongoing litigation" (the "Second Koustis Active Litigation Letter"). *See*, the Second Koustis Active Litigation Letter, attached hereto as <u>Exhibit 4</u>.

57. Since Koustis did not receive all the information requested through the RFI portion of the Koustis Inquiries, on August 10, 2020, Koustis, through counsel, sent an NOE to SPS via certified mail to the Designated Address (the "Second Koustis NOE"). *See*, the Second Koustis NOE, attached hereto as <u>Exhibit 5</u>.

58. On or about August 14, 2020, SPS sent an Active Litigation Letter to Koustis's counsel stating that it would not be providing a detailed response to the Second Koustis NOE because his account and the issues presented in the Second Koustis NOE "are part of an ongoing litigation" (the "Third Koustis Active Litigation Letter"). *See*, the Third Koustis Active Litigation Letter, attached hereto as <u>Exhibit 6</u>.

59. Since Koustis had still not received a payoff statement as requested through the Koustis Inquiries and through the First Koustis NOE, on August 18, 2020, Koustis, through counsel, sent an NOE to SPS via certified mail to the Designated Address (the "Third Koustis NOE"). *See*, the Third Koustis NOE, attached hereto as <u>Exhibit 7</u>.

60. On or about September 2, 2020, Koustis received a copy of a payoff statement for his loan via facsimile from SPS's counsel in response to the Third Koustis NOE.

61. On or about September 16, 2020, SPS sent an Active Litigation Letter to Koustis's counsel stating that it would not be providing a detailed response to the Third Koustis NOE because his account and the issues presented in the Third Koustis NOE "are part of an ongoing litigation"

(the "Fourth Koustis Active Litigation Letter"). *See*, the Fourth Koustis Active Litigation Letter, attached hereto as Exhibit 8.

62.     Koustis was harmed by SPS's failure to respond to the Koustis Inquiries because Koustis incurred costs relative to sending the Koustis Inquiries—such as postage and attorneys' fees—but did not receive the information to which he was legally entitled, pursuant to RESPA and Regulation X. Indeed, as noted above, when SPS "failed to do that which it was obligated to do [under RESPA]" in response to the Koustis Inquiries, the time and expense associated with Koustis's submission of the Koustis Inquiries "metamorphosed into damages." *E.g.*, *Marais*, 24 F.Supp.3d at 728.

63.     Had SPS responded to the Koustis Inquiries, Koustis would not have needed to send the First Koustis NOE or the Second Koustis NOE to SPS.

64.     Koustis was also harmed by SPS's failure to respond to the Koustis Inquiries because Koustis incurred costs relative to sending the First Koustis NOE and the Second Koustis NOE that he would not otherwise have incurred—such as postage and attorneys' fees—had SPS properly responded to the Koustis Inquiries.

65.     Had SPS responded to the First Koustis NOE, Koustis would not have needed to send the Third Koustis NOE to SPS.

66.     Koustis was also harmed by SPS's failure to respond to the First Koustis NOE because Koustis incurred costs relative to sending the Third Koustis NOE that he would not otherwise have incurred—such as postage and attorneys' fees—had SPS properly responded to the First Koustis NOE.

67.     In addition to the harm Koustis incurred as a result of SPS's failure to properly respond to the Koustis Inquiries, Koustis was harmed by SPS's failure to respond to the First

Koustis NOE and the Second Koustis NOE because Koustis incurred costs relative to sending the such correspondence—such as postage and attorneys' fees—but SPS did not perform the investigation into the errors he asserted, as required by RESPA and Regulation X. Indeed, as noted above, when SPS "failed to do that which it was obligated to do [under RESPA]" in response to the First Koustis NOE and the Second Koustis NOE, the time and expense associated with Koustis's submission of such correspondence "metamorphosed into damages." *E.g.*, *Marais*, 24 F.Supp.3d at 728.

### *Plaintiff Collins*

68.     On or about January 22, 2019, SPS sent correspondence to Collins stating that SPS "can confirm that Ronald J. Collins is the successor in interest" in relation to the loan at issue.[2]

69.     Collins, through counsel, sent a Borrower Inquiry dated February 15, 2019 to SPS via certified mail to the Designated Address (the "First Collins Inquiry") and a Borrower Inquiry dated February 19, 2019 to SPS via certified mail to the Designate Address (the "Second Collins Inquiry"). *See*, the First Collins Inquiry and the Second Collins Inquiry (collectively, the "Collins Inquiries"), attached hereto as Exhibit 9.  The First Collins Inquiry consisted of an RFI. The Second Collins Inquiry consisted of an NOE.

70.     On or about March 4, 2019, SPS sent an Active Litigation Letter to Collins's counsel stating that it would not be providing a detailed response to the Collins Inquiries because his account and the issues presented in the Collins Inquiries "are part of an ongoing litigation" (the

---

[2] "A confirmed successor in interest shall be considered a borrower for purposes of § 1024.17 and this subpart." 12 C.F.R. § 1024.30(d). "With respect to the written request, a servicer shall treat the potential successor in interest as a borrower for purposes of the requirements of paragraphs (c) through (g) of this section." 12 C.F.R. § 1024.36(i)(1).

"First Collins Active Litigation Letter"). *See*, the First Collins Active Litigation Letter, attached hereto as Exhibit 10.

71.    Since Collins did not receive a response containing the information requested or a response to the errors alleged through the Collins Inquiries, on April 1, 2020, Collins, through counsel, sent an NOE to SPS via certified mail to the Designated Address (the "First Collins NOE"). *See*, the First Collins NOE, attached hereto as Exhibit 11.

72.    Collins was harmed by SPS's failure to respond to the Collins Inquiries because Collins incurred costs relative to sending the Collins Inquiries—such as postage and attorneys' fees—but did not receive the information to which he was legally entitled, pursuant to RESPA and Regulation X. Indeed, as noted above, when SPS "failed to do that which it was obligated to do [under RESPA]" in response to the Collins Inquiries, the time and expense associated with Collins's submission of the Collins Inquiries "metamorphosed into damages." *E.g.*, *Marais*, 24 F.Supp.3d at 728.

73.    Had SPS responded to the Collins Inquiries, Collins would not have needed to send the First Collins NOE to SPS.

74.    Collins was also harmed by SPS's failure to respond to the Collins Inquiries because Collins incurred costs relative to sending the First Collins NOE that he would not otherwise have incurred—such as postage and attorneys' fees—had SPS properly responded to the Collins Inquiries.

## **CLASS ACTION ALLEGATIONS**

75.    **Class Definition**: Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23 on behalf of a class of similarly situated individuals and entities (the "Class"), defined as follows:

> All loan borrowers in the United States (1) who submitted to SPS a Borrower Inquiry, in the form of a QWR, RFI, NOE, and/or Other Covered

Inquiry, and (2) to whom SPS refused to provide a complete response relative to the information requested and/or perform an investigation into the errors asserted therein on the grounds that "the issues presented in the inquiries are part of an ongoing litigation"—*i.e.*, to whom SPS sent an Active Litigation Letter.

Excluded from the Class are: (1) Defendant, Defendant's agents, subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest, and those entities' current and former employees, officers, and directors; (2) the Judge to whom this case is assigned and the Judge's immediate family; (3) any person who executes and files a timely request for exclusion from the Class; (4) any persons who have had their claims in this matter finally adjudicated and/or otherwise released; and (5) the legal representatives, successors and assigns of any such excluded person.

76. **Subclass Definition**: Plaintiffs also bring this action pursuant to Fed. R. Civ. P. 23 on behalf of a subclass of similarly situated individuals and entities ("the Subclass"), defined as follows:

All loan borrowers in the United States (1) who submitted to SPS a Borrower Inquiry, in the form of a QWR, RFI, NOE, and/or Other Covered Inquiry, and (2) to whom SPS refused to provide a complete response relative to the information requested and/or perform an investigation into the errors asserted therein on the grounds that "the issues presented in the inquiries are part of an ongoing litigation"—*i.e.*, to whom SPS sent an Active Litigation Letter—and (3) who submitted to SPS an NOE, as defined by 12 C.F.R. § 1024.35 or otherwise covered under 12 U.S.C. § 2605(k)(1)(C), related to SPS's response.

Excluded from the Subclass are: (1) Defendant, Defendant's agents, subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest, and those entities' current and former employees, officers, and directors; (2) the Judge to whom this case is assigned and the Judge's immediate family; (3) any person who executes and files a timely request for exclusion from the Subclass; (4) any persons who have had their claims in this matter finally adjudicated and/or otherwise released; and (5) the legal representatives, successors and assigns of any such excluded person.

77. **Numerosity and Ascertainability**: Upon information and belief, the Class is comprised of more than forty (40) members, such that the Class is so numerous that joinder of all

members is impractical. This conclusion is reasonable because SPS is one of the largest mortgage providers in the country, which, as of June 30, 2018, serviced 658,260 loans in the United States totaling $111,489,380,000 in unpaid principal balances in aggregate.[3] While the exact number of members in the Class is presently unknown and can only be ascertained through discovery, Class members can easily be identified through Defendant's records or by other means.

78. **Commonality and Predominance:** All members of the Class have been subject to and affected by a uniform course of conduct; specifically, SPS refusing to provide a substantive response to Borrower Inquiries by claiming an "active litigation" exception. There are questions of law and fact common to the proposed Class that predominate over any individual questions, including:

a. Whether SPS sent Active Litigation Letters in response to Plaintiffs' and Class members' Borrower Inquiries;

b. Whether SPS's Active Litigation Letters failed to provide substantive responses to Plaintiffs' and Class members' Borrower Inquiries in violation of RESPA and Regulation X;

c. Whether SPS's practice of sending Active Litigation Letters is a sustained pattern and practice of noncompliance with RESPA and Regulation X;

d. Whether Plaintiffs and Class members suffered actual damages, and the measure and amount of those damages; and,

e. Whether Plaintiffs and Class members are entitled to recover statutory damages.

79. **Typicality**: Plaintiffs' claims are typical of the claims of the Class. Plaintiffs and Class members were denied a substantive response to which they were entitled because Defendant

---

[3] *Servicer Evaluation Select Portfolio Servicing Inc.*, S&P Global Ratings, December 21, 2018 (https://www.standardandpoors.com/en_US/web/guest/article/-/view/sourceId/10806518) (last accessed October 14, 2020).

unlawfully refused to produce information due to an erroneous "active litigation" exception, and Plaintiffs and Class members incurred damages as a result.

80.   **Adequacy**: Plaintiffs will adequately represent the interests of the Class and do not have adverse interests to the Class. Plaintiffs' counsel has extensive experience litigating consumer class actions.

81.   **Superiority**: A class action is the superior method for the quick and efficient adjudication of this controversy. If individual Class members prosecuted separate actions it may create a risk of inconsistent or varying judgments that would establish incompatible standards of conduct.

## COUNT I
### (Violations of 12 U.S.C. § 2605(e)(2), 12 U.S.C. § 2605(k)(1), 12 C.F.R. § 1024.35, and 12 C.F.R. § 1024.36) (On behalf of Plaintiffs and the Class)

82.   Plaintiffs repeat and reallege paragraphs 1 through 81 with the same force and effect as though fully set forth herein.

83.   Plaintiffs and Class members submitted Borrower Inquiries to SPS at the Designated Address.

84.   Plaintiffs' and Class members' Borrower Inquiries requested specific information related to their loans, and/or asserted that SPS committed specific errors related to the servicing of their loans, as contemplated by, *inter alia*, 12 U.S.C. § 2605(e)(1), 12 C.F.R. § 1024.35, 12 C.F.R. § 1024.36, and/or 12 U.S.C. § 2605(k)(1).

85.   SPS failed to provide a substantive written response to Plaintiffs' and Class members' Borrower Inquiries and/or failed to correct any of the errors asserted in Plaintiffs' and Class members' Borrower Inquiries within the applicable timeframes of seven (7), ten (10), or thirty (30) business days of receipt—that is, within seven (7), ten (10), or thirty (30) business days

of arrival at the Designated Address—as required by 12 U.S.C. § 2605(e)(2), 12 C.F.R. § 1024.35(e), 12 C.F.R. § 1024.36(d), and 12 U.S.C. § 2605(k)(1). Instead, SPS replied to Plaintiffs' and Class members' Borrower Inquiries with Active Litigation Letters.

86.     SPS's failure to provide appropriate responses to Plaintiffs' and Class members' Borrower Inquiries within the applicable timeframes of seven (7), ten (10), or thirty (30) business days of receipt constitutes a clear violation of the requirements of 12 U.S.C. § 2605(e)(2), 12 C.F.R. § 1024.35, 12 C.F.R. § 1024.36, and 12 U.S.C. § 2605(k)(1). Indeed, 12 C.F.R. § 1024.35(g) and 12 C.F.R. § 1024.36(f) do not provide for any such "active litigation" exception to SPS's duty to respond to Borrower Inquiries.

87.     Plaintiffs and Class members were harmed because they incurred the expenses associated with sending Borrower Inquiries—such as their time, postage, etc.—but did not timely receive the information or responses to which they were legally entitled, pursuant to RESPA and Regulation X.

88.     SPS is evading its legal obligations and has effectively stripped borrowers of their rights to submit Borrower Inquiries within and subject to the protective framework of RESPA by claiming exceptions to its obligation to respond that have no basis in fact or law.

89.     SPS's actions are in continuation of a pattern and practice of behavior in conscious disregard of the Plaintiffs' and Class members' rights.

90.     As a result of SPS's actions, SPS is liable to Plaintiffs and Class members for actual damages, statutory damages, costs, and attorney fees. 12 U.S.C. §§ 2605(f)(2)-(3).

## COUNT II
### (Violations of 12 U.S.C. §§ 2605(k)(1)(C) and (E), and 12 C.F.R. § 1024.35)
### (On behalf of Plaintiffs and the Subclass)

91.     Plaintiffs repeat and reallege paragraphs 1 through 81 with the same force and effect as though fully set forth herein.

92.     Plaintiffs and Class members submitted Borrower Inquiries to SPS at the Designated Address.

93.     Plaintiffs' and Class members' Borrower Inquiries requested specific information related to their loans, and/or asserted that SPS committed specific errors related to the servicing of their loans, as contemplated by, *inter alia*, 12 U.S.C. § 2605(e)(1), 12 C.F.R. § 1024.35, 12 C.F.R. § 1024.36, and/or 12 U.S.C. § 2605(k)(1).

94.     SPS failed to provide a substantive written response to Plaintiffs' and Class members' Borrower Inquiries and/or failed to correct any of the errors asserted in Plaintiffs' and Class members' Borrower Inquiries within the applicable timeframes of seven (7), ten (10), or thirty (30) business days of receipt—that is, within seven (7), ten (10), or thirty (30) business days of arrival at the Designated Address—as required by 12 U.S.C. § 2605(e)(2), 12 C.F.R. § 1024.35(e), 12 C.F.R. § 1024.36(d), and 12 U.S.C. § 2605(k)(1). Instead, SPS replied to Plaintiffs' and Class members' Borrower Inquiries with Active Litigation Letters.

95.     SPS's failure to provide appropriate responses to Plaintiffs' and Class members' Borrower Inquiries within the applicable timeframes of seven (7), ten (10), or thirty (30) business days of receipt constitutes a clear violation of the requirements of 12 U.S.C. § 2605(e)(2), 12 C.F.R. § 1024.35, 12 C.F.R. § 1024.36, and 12 U.S.C. § 2605(k)(1). Indeed, 12 C.F.R. § 1024.35(g) and 12 C.F.R. § 1024.36(f) do not provide for any such "active litigation" exception to SPS's duty to respond to Borrower Inquiries.

96.     As a result of SPS's assertion of an erroneous "active litigation" exception to its obligations under RESPA and Regulation X, Plaintiffs and Subclass members were required to submit additional NOEs to SPS regarding that issue.

97.     Had SPS adequately responded to Plaintiffs' and Subclass members' initial Borrower Inquiries, Plaintiffs and Subclass members would not have needed to send additional NOEs regarding SPS's erroneous assertion of an "active litigation" exception to its obligations under RESPA and Regulation X.

98.     Plaintiffs and Subclass members were harmed by SPS's failure to adequately respond to their Borrower Inquiries because it required them to incur the time and expenses associated with sending the subsequent NOEs after receiving Active Litigation Letters from SPS.

99.     SPS is evading its legal obligations and has effectively stripped borrowers of their rights to submit Borrower Inquiries within and subject to the protective framework of RESPA by claiming exceptions to its obligation to respond that have no basis in fact or law.

100.    SPS's actions are in continuation of a pattern and practice of behavior in conscious disregard of the Plaintiffs' and Subclass members' rights.

101.    As a result of SPS's actions, SPS is liable to Plaintiffs and Subclass members for actual damages, statutory damages, costs, and attorney fees. 12 U.S.C. §§ 2605(f)(2)-(3).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs GEORGE G. KOUSTIS and RONALD J. COLLINS, individually, and on behalf of the Class and Subclass, pray for an Order as follows:

A.      Finding that this action satisfies the prerequisites for maintenance as a class action and certifying the Class and/or Subclass defined herein;

B.      Designating Plaintiffs as representatives of the Class and Subclass and their undersigned counsel as Class Counsel;

C.      Entering judgment in favor of Plaintiffs, the Class, and Subclass and against Defendant;

D.      Awarding Plaintiffs, the Class, and Subclass their actual damages and statutory damages as allowed under RESPA;

E.      Awarding Plaintiffs, the Class, and Subclass attorneys' fees and costs, including interest thereon, as allowed or required by law; and,

F.      Granting all such further and other relief as this Court deems just and appropriate.

## **JURY DEMAND**

Plaintiffs hereby request a trial by jury on all issues.

Respectfully submitted,

*/s/Marc E. Dann*
Marc E. Dann (0039425)
Daniel M. Solar (0085632)
Brian D. Flick (0081605)
DANN LAW
P.O. Box 6031040
Cleveland, OH 44103
Telephone: (216) 373-0539
notices@dannlaw.com

Thomas A. Zimmerman, Jr. (*pro hac vice* anticipated)
tom@attorneyzim.com
Matthew C. De Re (*pro hac vice* anticipated)
matt@attorneyzim.com
ZIMMERMAN LAW OFFICES, P.C.
77 W. Washington Street, Suite 1220
Chicago, Illinois 60602
Telephone: (312) 440-0020

*Counsel for Plaintiffs George G. Koustis and Ronald J. Collins and the Putative Class*